UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRANSPRO, INC., | ) | Case No.: 1:02 CV 2329 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| LEGGETT & PLATT, INCORPORATED, | ) | |
| | ) | FINDINGS OF FACTS AND |
| Defendant | ) | CONCLUSIONS OF LAW |

The above-captioned case was tried to the court between November 29 and December 1, 2006.  Plaintiff TransPro, Inc. ("TransPro" or "Plaintiff") offered the testimony of Andrew Finger, an accounting expert, and the deposition testimony of Timothy Coyne at trial.  Defendant Leggett & Platt, Incorporated ("Leggett" or "Defendant") offered the testimony of James Patterson, Scott Douglas, Joseph Mahler, James Ukena, Susan McCoy and John Lane, an accounting expert, as well as the deposition testimony of Timothy Coyne and James Stern.

## I. BACKGROUND

1.  TransPro is a Delaware corporation that maintains its principal place of business in Connecticut.  (Nov. 30, 2006, Stipulation of Facts, ECF No. 130 ("Stip.") ¶ 1.)

2.  Leggett is a Missouri corporation that maintains its principal place of business in Missouri.

(Stip. ¶ 2.)

3.  This case is a business dispute arising out of the sale of a business unit.

4.  On August 17, 2000, Leggett entered into an asset purchase agreement (the "Agreement") to acquire the assets of TransPro's Crown North America Division (the "Division").  (*See* Agreement, Pl.'s Ex. 1.)

5.  The Division was engaged in the business of designing, engineering, manufacturing, selling and installing specialized interiors for vans, utility trucks and other specialty vehicles, as well as designing, manufacturing and selling highly engineered, custom products and components, such as enclosures, cabinets, racks, and shelving for the telecommunications industry.  (Stip. ¶ 4.)

6.  The Division has locations in the United States and Canada; the Canadian business is a separately-owned and operated company called Crown-VMS Canada, Limited ("VMS"). VMS was a separately incorporated legal entity, organized under Canadian law.  As such, its transfer to Leggett was accomplished through the transfer of VMS's capital stock, which the  Agreement defines as a "Purchased Asset."  (Stip. ¶  5; Tr. pp. 73, 140; Pl.'s Ex. 1 p.3.)

7.  The principal negotiators of the Agreement for TransPro were Tim Coyne ("Coyne"), who was then TransPro's Chief Financial Officer, but left the Company in 2001, and James Stern ("Stern"), a corporate attorney from Foley & Lardner LLP.  (Stip. ¶ 6.)

8.  The principal negotiators of the Agreement for Leggett were James Ukena ("Ukena"), then Leggett's Director of Mergers and Acquisitions, and Scott Douglas ("Douglas"), one of Leggett's in-house attorneys.  (Stip. ¶ 6.)

9.  The transactions contemplated by the Agreement closed on or about May 5, 2000 (the

"Closing").  (Stip. ¶ 7.)

10.    The Agreement contained, *inter alia*, a Net Asset Value ("NAV") representation.  That representation, found in Section 4.22 of the Agreement, established that the Purchased Assets (as defined in the Agreement) would have a NAV of not less that $15.5 million:

> 4.22  Net Asset Value. The Net Asset Value of the Purchased Assets at Closing will be at least $15,500,000.00.  "Net Asset Value" shall mean the dollar amount equal to the book value of the Purchased Assets minus the book value of Assumed Liabilities.  Book value will be determined from Seller's and VMS' books and records as of the opening of business on the Closing Date (prior to any write-ups under purchase accounting on Buyer's books and records) under GAAP as applied by Seller and VMS prior to Closing.

(Agreement, § 4.22, Pl.'s Ex. 1 p. 19.)

11.    The Agreement represented that the NAV was to be "at least $15,500,000."  (*Id.*)  If that representation turned out to be inaccurate, the parties agreed that Leggett would be entitled to a post-closing adjustment in the purchase price.  (Pl.'s Ex. 1 pp. 32-35.)

12.    In 2001, Susan McCoy ("McCoy"), Leggett's Director of Due Diligence, determined that the NAV of the purchased assets was only $15,180,373, resulting in a deficiency of $319,627.  (Stip. ¶ 8.)

13.    On April 30, 2001, Leggett notified TransPro of the NAV breach, and Leggett requested that TransPro indemnify it in the amount of $319,627.  TransPro, however, denied any breach of the NAV representation.  (*Id.*)

14.    In addition, Section 2.2 of the Agreement lists certain liabilities of TransPro that Leggett would not assume "[e]xcept to the extent accrued or reserved on the Recent Statements" and for which TransPro agreed to indemnify Leggett.  (Pl.'s Ex. 1 p. 5.)

15.    Specifically, Section 2.2 states, "Liabilities Not to be Assumed.  Except to the extent accrued

or reserved on the Recent Statements (defined in Section 4.4), and notwithstanding Section 2.1, [Leggett] is not assuming and [TransPro] shall not be deemed to have transferred to [Leggett], and [TransPro] shall indemnify [Leggett] against, the following Liabilities of [TransPro] . . . ." (*Id.*)  Thus, under Section 2.2(i) of the Agreement, Leggett expressly did not assume any liabilities related to former TransPro employees, unless the employees subsequently became active Leggett employees.  Under this provision, TransPro agreed to indemnify Leggett for these liabilities.  (Pl.'s Ex. 1 pp. 5-6.)

16.　　Additionally, in the aftermath of the sale, a large number of payroll checks that should have been paid by Leggett were paid by TransPro.  TransPro seeks reimbursement for these payroll expenses.

17.　　The total amount TransPro paid in payroll expenses was $573,553.  Leggett has paid TransPro $253,926, and claims that it is entitled to set-off the remaining $319,627 against the $319,627 Leggett alleges TransPro owes it for TransPro's breach of the § 4.22 NAV representation.  (Tr. pp. 78-82.)

18.　　TransPro filed its Complaint on November 26, 2002, asserting claims for the $319,627 in payroll expenses, and for additional expenses related to medical claims TransPro paid after the Closing, including an automobile claim incurred by Ken Landes, and a settlement of claims with Tabitha Jump Coy.  (Complaint, ECF No. 1.)

19.　　Leggett filed its Counterclaims on January 6, 2003, asserting claims for breach of the NAV representation, contending that the NAV was actually $15,180,373, and seeking damages in the amount of the shortfall.  (Counterclaim, ECF No. 8.)

20.     Leggett also requested that TransPro reimburse and indemnify it for workers' compensation payments made to three former Ohio employees, in the total amount of $159,786.49, that it alleges it should not have been responsible for under § 2.2 of the Agreement.  (Tr. pp. 82-86; Jt. Ex. 10; Stip ¶¶ 17-19.)

21.     The parties have been unable to resolve these disputes regarding the NAV,  payroll, medical claims, and workers' compensation.

## II. PREVIOUS FINDINGS BY THE COURT AND STIPULATIONS BY THE PARTIES

1.      This court previously found that TransPro was entitled to recover the unpaid balance of the improperly paid payroll expenses as a matter of law, subject to any right of set-off Leggett might establish at trial.  The amount to which TransPro is entitled with respect to the payroll expenses equals $319,627.00.  (Sept. 21, 2005 Order pp. 21-22, ECF No. 73.)

2.      The parties have stipulated that Leggett is obligated to reimburse TransPro in the amount of $9,218.80 for medical claims TransPro paid after the Closing on behalf of employees who became Leggett employees, subject to any right of set-off that Leggett may establish at trial. (Stip. ¶ 9.)

3.      The parties further stipulated that Leggett is obligated to reimburse TransPro in the amount of $20,906.00 for amounts TransPro paid after the Closing in connection with an automobile claim incurred by Ken Landes, again subject to any right of set-off that Leggett may establish at trial.  (Stip. ¶ 11.)

4.      Pursuant to the terms of the Stipulation, TransPro withdrew with prejudice any claim for reimbursement regarding settlement amounts it paid in connection with the claims of Tabitha Jump Coy.  (Stip. ¶¶ 15-16.)

-5-

### III. LEGGETT'S AFFIRMATIVE DEFENSES/COUNTERCLAIMS

**A.      Leggett's Workers' Compensation Counterclaim**

1.      Section 2.2 of the Agreement lists certain liabilities of TransPro that Leggett did not assume "[e]xcept to the extent accrued or reserved on the Recent Statements" and for which TransPro agreed to indemnify Leggett.  (Pl.'s Ex. 1, pp. 5-6.)

2.      Under Section 2.2(i), Leggett did not assume any liabilities related to former employees. More specifically, Leggett did not assume "[a]ny Liabilities relating to former employees of the Business unless such employees become Active Union Represented Employees or Active Non-Represented Employees under Article 6 [of the Agreement]."  (Pl. Ex. 1, p. 6.)

3.      The parties stipulated that Evelyn Buchanan, Alberta Livingston, and Gary Simmerman (the "Three Former Employees") are former TransPro employees who never became active employees of Leggett and are "former employees" as defined in Article 2.2(i).  Through November 10, 2006, Leggett's workers' compensation payments related to the Three Former Employees are as follows: (1) Evelyn Buchanan - $87,257.60; (2) Alberta Livingston - $12,704.43; and (3) Gary Simmerman - $59,824.46.  (Stip. ¶¶ 17-19.)

4.      Leggett requested that TransPro reimburse it for the amounts it has paid to the Three Former Employees, but TransPro refused to do so.  (Tr. pp. 86-87; Jt. Ex. 10.)

5.      On April 8, 2002, McCoy sent a letter to TransPro's Chief Financial Officer, Richard Wisot, requesting reimbursement for the workers' compensation payments related to the Three Former Employees through that date.  (Jt. Ex. 10.)

-6-

6.  In addition, in November 2004, Douglas provided a spreadsheet containing more detailed, updated information to TransPro at his Fed. R. Civ. P. 30(b)(6) deposition in this matter. (Tr. pp. 86-87, 111-112.)

7.  Under Section 2.2, the liabilities listed are not assumed, "except to the extent accrued or reserved on the Recent Statements."  (Pl.'s Ex. 1 p. 5.)  Thus, the accrual or reserve is an exception to Leggett's general non-assumption and TransPro's indemnification for the liabilities listed in Section 2.2.

8.  A party seeking the protection of a contractual exception bears the burden of establishing the exception.  *See Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1070 (Del. Ch. 2004); *Davies Flying Service v. United States*, 216 F.2d 104, 106 (6th Cir. 1954) (noting the "familiar rule that one who seeks advantage of an exception in a contractual stipulation as the basis of his claim is charged with the burden of proving facts necessary to bring himself within such exception.").

9.  Here, TransPro is seeking the protection of the accrual or reserve exception.  TransPro, therefore, bears the burden of establishing that there was an accrual or reserve for those specific workers' compensation payments related to the Three Former Employees on the Recent Statements.

10.  There was no evidence presented showing any accrual or reserve for the liabilities relating to the Three Former Employees.  In fact, the evidence presented, as discussed below, showed that the Division never accrued or reserved for the liabilities relating to the Three Former Employees on any financial statements.

11.  James Patterson ("Patterson"), the Controller for the Division in Wooster, testified that the Division had three workers' compensation accounts: (1) the standard workers' compensation account for existing employees; (2) an account administered by Cantlon Associates, Inc. dealing with former Ohio employees (the "Cantlon Account"); and (3) an account related to non-Ohio employees from the Allen Group.  (Tr. pp. 41-42.)

12.  The Three Former Employees were former Ohio employees, and their claims were paid out of the Cantlon Account.  (Tr. pp. 43, 46.)

13.  Joe Mahler ("Mahler"), the Division's Vice President of Finance when the Agreement closed and the person responsible for preparing all of the Division's financial statements, testified that there was no accrual or reserve ever set up for the Cantlon Account, rather the Division expensed the payments as they were made.  (Tr. p. 121-122.)

14.  Patterson confirmed that the Division did not accrue for payments made to the Cantlon Account, but expensed them.  (Tr. pp.44-46, 49.)

15.  Patterson testified that the Division would make payments to the Cantlon Account when needed, not payments on a regular interval, because the Division did not know in advance how much would need to be paid.  Consequently, no accrual was set up.  (Tr. pp. 43-45, 49.)

16.  Mahler also testified that any accrual for Ohio employees would have been for only the active Ohio employees and not for the Cantlon Account, or the Three Former Employees. (Tr. pp. 129-130.)

17.  Under Section 2.2, the accrual or reserve for the unassumed liabilities was to appear on the Recent Statements as defined in Section 4.4.  (Pl.'s Ex. 1, p. 5.)

-8-

18.    Section 4.4(a) defines the Recent Statements as "[t]he [financial] statements as of and for the period ending February 29, 2000," and they were to be included as Schedule 4.4 to the Agreement.  (Pl.'s Ex. 1, p. 9.)

19.    Defendant's Exhibit AA is the entire compilation of documents constituting the Agreement, including all schedules and attachments.  Schedule 4.4(a) states that "Balance Sheets and Statements of Income for the periods ending December 31, 1996, 1997, 1998, and 1999" are attached.  Schedule 4.4(a), however, does not refer to financial statements for the period ending February 29, 2000, and no financial statements are attached.  (Tr. p. 91-92 ; Def.'s Ex. AA, p. 78.)

20.    Thus, there are no Recent Statements under Section 4.4(a) of the Agreement, and, consequently, there are no liabilities accrued or reserved for under the Agreement.

21.    Furthermore, financial statements presented at trial for the period ending February 2000, (*see* Jt. Ex. 4), which were not attached to Defendant's Exhibit AA, do not show any accrual or reserve for the liabilities related to the Three Former Employees.  Thus, even if one assumed those statements should have been attached as the Recent Statements, they still prove no accrual.  (*See* Jt. Ex. 4 and Def.'s Ex. FFF.)

22.    The evidence presented at trial established that TransPro never accrued or reserved for liabilities related to the Three Former Employees or the Cantlon Account on any of its financial statements.

23.    As a result, the court finds that the accrual or reserve exception does not apply to Leggett's workers' compensation claim.

-9-

24.    Accordingly, the court finds that TransPro owes Leggett $159,786.49, subject to any award of prejudgment interest, for payments related to the Three Former Employees through November 10, 2006.  The court further finds and declares that TransPro shall be liable and shall reimburse Leggett for all payments related to the Three Former Employees after November 10, 2006.

**B.    Leggett's Claim that TransPro Breached the NAV Representation**

1.    In Section 4.22 of the Agreement, TransPro represented that the NAV of the purchased assets would be at least $15.5 million.  The NAV is defined as "the dollar amount equal to the book value of the Purchased Assets minus the book value of the Assumed Liabilities." Book value was to "be determined from Seller's and VMS' books and records as of the opening of business on the Closing Date (prior to any write ups under purchase accounting on Buyer's books and records) under GAAP as applied by Seller and VMS prior to Closing." (Pl.'s Ex. 1, p. 19.)

2.    The relevant portion of Section 4.22 is as follows:

4.22  Net Asset Value.  The Net Asset Value of the Purchased Assets at Closing will be at least $15,500,000.  "Net Asset Value" shall mean the dollar amount equal to the book value of the Purchased Assets minus the book value of the Assumed Liabilities.  Book value will be determined from Seller's and VMS' books and records as of the opening of business on the Closing Date (prior to any write ups under purchase accounting on Buyer's books and records) under GAAP as applied by Seller and VMS prior to Closing.

(Pl.'s Ex. 1, p. 19.)

3.    Thus, there are two different ways an item can be included in the NAV calculation, as a Purchased Asset or as an Assumed Liability.  Merely because the item is not within one

category, e.g. Assumed Liability, does not foreclose it from being included in the other category, e.g. Purchased Asset.

4.  If the NAV fell below $15.5 million, Leggett is entitled to a dollar-for-dollar reduction in the purchase price under Sections 11.1 and 11.5 of the Agreement.  (Pl.'s Ex. 1, pp. 32-35; Tr. pp. 62-64.)

5.  In August of 2000, McCoy calculated the NAV and determined that it was slightly above the $15.5 million threshold.  (Tr. p. 186.)

6.  Subsequently, claims for medical reimbursement and workers' compensation incurred but not recorded before May 5, 2000, were made by TransPro to Leggett.  (Tr. pp. 186-187.)

7.  The court has already held that Leggett could consider this post-closing information when calculating the NAV.  (*See* Order pp. 15-16, ECF No. 73.)

8.  As a result of the medical reimbursement and workers' compensation claims, the NAV fell below the $15.5 million threshold.  (Tr. p. 200.)

9.  McCoy's final NAV calculation was $15,180,373, resulting in a deficit of $319,627.  (*Id.*)

10.  On April 30, 2001, Leggett formally informed TransPro that it was making a claim for breach of the NAV representation in the amount of $319,627.  (Tr. pp. 80-81; Def.'s Ex. QQ.)

11.  McCoy began calculating the NAV with the consolidated column of Joint Exhibit 5, which is the information that appears on the Seller TransPro's own books and records.  (Tr. pp. 126-127, 177.)  She examined all of those accounts to determine whether any adjustments needed to be made to the totals.  (Tr. pp. 188-189, 235.)

-11-

12.     McCoy made adjustments that she classified into thirteen categories and then assigned each

        category a letter.  While the net effect of the adjustments was to decrease the NAV, McCoy

        also made significant adjustments that increased the NAV.  (Tr. pp. 188-193; Jt. Ex. 2.)

13.     For the reasons that follow, the court finds that McCoy's NAV calculations were proper.

        **1.      VMS's payables must be accounted for in the NAV calculation through the
                VMS Stock, a Purchased Asset.**

1.      One of the Purchased Assets was the VMS Stock under Section 1.1(n) of the Agreement.

        (Tr. pp. 182, Pl.'s Ex. 1, p. 3.)

2.      Consequently, when determining the book value of the Purchased Assets under Section 4.22,

        one must determine the book value of the VMS Stock.

3.      When determining the book value of the VMS Stock, one must account for all of VMS's

        assets and liabilities.  (Tr. pp. 141-142, 182, 391-392.)

4.      Ukena, McCoy, and TransPro's own expert, Andrew Finger ("Finger"), all agreed that when

        calculating a stock's book value, one must account for its liabilities.  (Tr. pp. 141-142, 182,

        391-392.)

5.      TransPro had presented to Leggett that VMS's liabilities would be included in the NAV

        calculation.  (Tr. pp. 141-142.)

6.      TransPro's expert, Finger, determined the book value of the VMS Stock.  In doing so, he

        prepared his own balance sheet for VMS based on Joint Exhibit 5 (the same document on

        which McCoy based her NAV calculation).  The amounts Finger used on his VMS balance

        sheet correspond to the book value amounts for VMS's books and records under a Section

        4.22 calculation.  Finger's figures to be included in the Section 4.22 calculation include all

-12-

of VMS's payables, including the liability for a demand note from VMS to TransPro (the "Note").  (Tr. pp. 391-92.)

### a.     VMS's Royal Bank Accounts

1.    VMS had two Royal Bank Accounts with a combined negative balance of $109,201.11.  (Jt. Ex. 2, p. 2; Tr. p. 177.)

2.    Under GAAP, a bank account with a negative cash balance is a liability.  (Tr. p. 278.)

3.    Thus, under GAAP, the Royal Bank Accounts are VMS liabilities.

4.    Plaintiff's own expert testified that McCoy's inclusion of these negative bank accounts in her calculation was appropriate and he included them as liabilities when he was calculating the VMS stock's book value.  (Tr. p. 278; Ex. PPP, p. 5.)

5.    The court therefore finds that McCoy properly treated the Royal Bank Accounts as liabilities when calculating the NAV and, consequently, that she properly reduced the NAV by $109,201.11.

### b.     The Note

1.    Another VMS liability was the Note.  (Tr. pp. 105-106, 392; *see* VMS Note, Pl. Ex. 6.)

2.    The court previously held that the payable side of the revolving demand Note was not an Assumed Liability under the Agreement.  (*See* Order pp. 17-18,  ECF No. 73.)

3.    The court, however, did not address whether the payable side of the Note must be included and accounted for in the NAV calculation through the VMS stock, a Purchased Asset.

4.    Because the payable side of the Note is a VMS liability, it must be considered and accounted for when calculating the NAV through the VMS stock, a Purchased Asset.  Indeed, Plaintiff's expert, Finger, listed the Note as a payable when he was calculating the VMS

-13-

stock's book value. Thus, in his own balance sheet showing what should be included in the NAV calculation of the VMS stock, Finger included the payable side of the Note. (Tr. pp. 182, 391-392, Def.'s Ex. PPP, p. 5.)

5. The court therefore finds that McCoy properly included the payable side of the Note when calculating the NAV and determined that its net effect was $0.

6. Because the payable side of the Note is a liability that must be accounted for in the NAV calculation, it directly offsets any value that might be assigned to the receivable side of the Note. The Note accordingly has no effect on the NAV, and McCoy properly treated it as having a value of $0 in her NAV calculation.

7. Even if one excludes the payable side of the Note from the NAV calculation, the Note still has no value under GAAP.

8. While the court has held that the Note's payable side was not an Assumed Liability under the Agreement, the court has also held that it must still determine the Note's book value as a receivable under GAAP as a Purchased Asset. (*See* Order pp. 7-8, ECF No. 89.)

9. Leggett's expert, John Lane ("Lane"), testified that the Note has no value under GAAP as a receivable because there is no third party from whom Leggett could collect on the Note. (Tr. pp. 271-275.)

10. Under GAAP, if no third party is going to pay the payable side of a note, there is no opportunity to collect on that note, and the note therefore has no value. (Tr. p. 272.) TransPro's own expert, Finger, and its former Chief Financial Officer, Coyne, confirmed this point. (Tr. pp. 383-385; Deposition of Timothy Coyne pp. 176-177.)

11.   While this court has held that VMS is a separate legal entity, a third party under GAAP is defined differently than a third party legally.  As Lane testified, a GAAP third party is a party unrelated to the company you are looking at, and it is not part of that company's consolidated group.  A GAAP third party is an entity separate and distinct from the company and its combined entities.  (Tr. pp. 264-265.)

12.   As Leggett's expert explained, "a large company will have a lot of legal entities within it.  And when you are reporting on that company, you can't look at each individual legal entity.  What you'd have to do is look at the consolidated group as a whole."  (Tr. p. 265.)

13.   VMS is not a third party under GAAP because it is a wholly-owned subsidiary, first of TransPro and then of Leggett.  Consequently, one could not collect on the Note from any third party outside of the consolidated group under GAAP.  The Note therefore has no value under GAAP.  (Tr. p. 272.)

14.   Accordingly, the court finds that McCoy properly valued the Note as $0 as a receivable under GAAP in the NAV calculation.

15.   In fact, McCoy treated the Note in the same manner that TransPro treated it on its books.  TransPro did not treat VMS as a third party under GAAP; it viewed VMS as part of the consolidated group with the Division.  Virtually every schedule TransPro produced showed both the U.S. operations and the Canadian operations as consolidated.  (Tr. pp. 275-277.)

16.   For example, Defendant's Exhibit FFF is TransPro's consolidation worksheets.  On these worksheets, there are two columns with Crown in their title.  One is titled Crown INP and the other is Crown Canada (VMS).  The Crown Canada column has no totals for the individual entries; there are zeros all of the way down.  It is clear from Exhibit FFF and the

-15-

supporting documents (for example Joint Exhibit 5) that TransPro viewed the Division as a consolidation of Crown U.S. and VMS.  (Tr. pp. 276-277.)

17.  On TransPro's consolidation worksheets, TransPro reflected the Note as a value of $0.  (Tr. pp. 277, 303.)

18.  The TransPro financial statements that were published would not have reflected the Note as a receivable.  (Deposition of Timothy Coyne pp. 177-178, 180.)

19.  Thus, TransPro's own books and records did not treat VMS as a third party under GAAP, and did not treat the Note as having any value as a receivable.  Consequently, VMS is not a third party "under GAAP as applied by Seller" from whom Leggett could collect on the Note.

20.  The court therefore finds that the Note has no value under GAAP, and that McCoy properly valued it as such in the NAV calculation.

21.  Furthermore, treating the Note as having a positive value would result in double counting of assets because the only assets that could be used to pay the liability side of the Note are already included in the NAV calculation.  VMS's assets are included in the NAV calculation.  Those assets are the only assets that VMS could have used to pay the liability side of the Note on May 5, 2000.  Treating the Note as having a positive value would therefore result in double counting those VMS assets, which is undisputed and contrary to GAAP.  (Tr. pp. 151-152, 302-303, 384-385.)

22.  Under GAAP, the consolidated balance sheet would only reflect the assets that could be used to pay the Note and not the Note itself.  (Tr. p. 274.)

23.  Thus, McCoy properly treated the Note as having no value when she calculated the NAV.

-16-

24.    The court therefore concludes that the Note's value is $0 under GAAP, as opposed to having the value of $1,018,091.90, as argued by TransPro.

**2.      McCoy's 401(k) Adjustment**

1.    McCoy adjusted the NAV by $41,423 for payments made to employee 401(k) accounts.  (Jt. Ex. 2, p. 2.)

2.    In his expert report and again at trial, Plaintiff's expert, Finger, stated that McCoy should not have made her 401(k) adjustment because the amount was already included in her payroll adjustment.  (Tr. pp. 359-360.)  The evidence presented at trial, including evidence Finger relied upon, however, demonstrated that McCoy's 401(k) adjustment was not included in her payroll adjustment.  (Tr. pp. 235-237.)

3.    On February 20, 2001, TransPro requested that Leggett reimburse it for payrolls accrued in the Division's balance sheet on May 5, 2000, that were funded after May 5, 2000.  The total requested reimbursement for this payroll was $573,553.  Attached to this letter was a schedule detailing the various items for which TransPro sought reimbursement.  (Def.'s Ex. GGG.)

4.    This schedule lists 401(k) contributions as a separate and distinct entry from the payroll and payroll-tax entries.  The two 401(k) entries are $4,089 and $40,955, for a total 401(k) contribution of $45,044.  The schedule lists two payroll entries of $20,206 and $463,427 and three payroll tax entries for $270,126; $7,996; and $69,429.  These are the same payroll numbers for which TransPro is seeking reimbursement in this case.  (Tr. pp. 235-237; Def.'s. Ex. GGG, pp. 3, 5.)

5.   McCoy used these same payroll numbers when calculating the NAV, i.e., the same numbers TransPro used as the basis for its payroll-reimbursement request.  (Tr. pp. 236-237.)

6.   McCoy adjusted the 401(k) entry in the NAV calculation by $41,423 to reflect a total of $45,044, the same amount for which TransPro requested reimbursement. (Tr. pp.236-237; Jt. Ex. 2, pp. 2, 92; Def.'s. Ex. GGG, pp. 3, 5.)

7.   McCoy's adjustments are directly consistent with TransPro's own numbers.  McCoy's calculation for the payroll adjustment includes the $20,206 and $463,427 payroll entries and the $270,126; $7,996; and $69,429 payroll-tax entries, but not the 401(k) entries.  (Tr. pp.236-237; Jt. Ex. 2, pp. 2, 24; Def.'s Ex. GGG, pp. 3, 5.)

8.   Thus, it is clear that McCoy's payroll adjustment did not include the 401(k) entries, and McCoy's 401(k) adjustment therefore did not duplicate or double count items in her payroll adjustment.

9.   Accordingly, the court finds that McCoy's payroll adjustment of $41,023 was proper.

### 3.   Materiality of McCoy's Adjustments

1.   TransPro and its expert, Finger, contend that McCoy should not have made her adjustments lettered B, C, F, G, H, I, J, K, L, and M (the "Contested Adjustments") because they were immaterial to the NAV calculation, and the original book value as reported was in accordance with GAAP.  (Tr. pp. 339, 344-346.)

2.   Under GAAP, one is to use the most current, accurate information available when preparing balance sheets or calculating net asset value.  (Tr. pp. 228-229, 264.)

3.   Finger does not dispute the accuracy of the Contested Adjustments, other than Adjustment M, which is the 401(k) adjustment, and, as indicated above, the court finds that McCoy's

-18-

401(k) adjustment was accurate.  Transpro and Finger only contend that McCoy should not have made the "Contested Adjustments" because they were immaterial to the NAV calculation.

4.  Defendant's expert, Lane, testified that when determining whether something is material under GAAP, one looks at the specific facts and circumstances of the situation.  For example, one would look at the purpose of the financial statements, who was going to use them, whether they involved loan covenants, and whether they involved any other covenants like the NAV representation here.  (Tr. p. 266.)

5.  Whether an entry or adjustment is material is a professional judgment dependent upon the individual facts and circumstances.  (Tr. p. 343.)

6.  The Financial Accounting Standards Board, which Transpro's expert cited in his report and recognized as pertinent, has articulated that, "[t]he more important a judgment item is, the finer the screen should be that will be used to determine whether it is material. For example . . . [a]n accounting change in circumstances that puts an enterprise in danger of being in breach of covenant regarding its financial condition may justify a lower materiality threshold than if its position were stronger."  (Pl. Ex. 80, pp. 44-45, Financial Accounting Standards Board, *Statement of Financial Accounting Concepts No. 2*, Qualitative Characteristics of Accounting Information, 128 (1980); Tr. p. 402.)

7.  The Financial Accounting Standards Board has also rejected any hard and fast rule for materiality because "no general standards of materiality can be formulated to take into account all the considerations that enter into an experienced human judgment."  (Pl.'s Ex. 84, p. 3, Securities and Exchange Commission Staff Accounting Bulletin No. 99 -

-19-

Materiality (Aug. 12, 1999) (citing FASB, *Statement of Financial Accounting Concepts No. 2*, Qualitative Characteristics of Accounting Information, 131 (1980)); Tr. pp. 402-404.) Indeed, "[m]agnitude by itself without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment." (Pl.'s Ex. 84, p. 3, Securities and Exchange Commission Staff Accounting Bulletin No. 99 - Materiality (Aug. 12, 1999)  (citing FASB, *Statement of Financial Accounting Concepts No. 2*, Qualitative Characteristics of Accounting Information, 125 (1980)); Tr. pp. 402-404.)

8.   According to the Securities and Exchange Commission Staff Accounting Bulletin No. 99, which Finger also cited and acknowledged as relevant, "[e]valuation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material." (Pl.'s Ex. 84, p. 3, Securities and Exchange Commission Staff Accounting Bulletin No. 99 - Materiality (Aug. 12, 1999).)  The Staff Accounting Bulletin No. 99 goes on to state that "[a]mong the considerations that may well render material a quantitatively small misstatement of a financial statement item are . . . [w]hether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements." (*Id.*; Tr. pp. 404-405.)

9.   The  Staff Accounting Bulletin No. 99 further provides that the effect of a misstatement cannot be eliminated by other misstatements whose effect may be to diminish the impact of the misstatement on other financial statement items.  (Pl.'s Ex. 84, p. 5, Securities and Exchange Commission Staff Accounting Bulletin No. 99 - Materiality (Aug. 12, 1999).)

-20-

Thus, one must look at adjustments that increase the NAV separately from adjustments that decrease the NAV.

10. In addition, one must look not only at each individual entry, but also at the cumulative effect of the entries. (Tr. pp. 283-285.)

11. Likewise, because the Agreement calls for a dollar-for-dollar reduction in the purchase price if the NAV is not $15.5 million, there is a much smaller materiality threshold. (Tr. pp. 266-267, 283.)

12. The adjustments Finger claims are immaterial range from $185,114 to $12,313 and they have a combined effect on the NAV of negative $93,156. (Tr. pp. 344-347.)

13. Finger did not include the $600,000 incurred-but-not-recorded medical claims adjustment when determining whether McCoy's adjustments were material. (Tr. p. 415.)

14. The court finds that McCoy's adjustments were all material because they all affected the extent to which TransPro breached its covenant, that is the NAV representation, and the amount of Leggett's recovery.

15. Furthermore, the parties agreed that claims for breaches of the NAV representation that were less than $10,000 would be material. In Section 11.5(b)(ii), the parties created a "mini basket" under which "[a]ny inaccuracy or breach of representation or warranty shall not constitute a Claim unless the amount for a particular inaccuracy or breach of representation or warranty exceeds $10,000." If the breach exceeds $10,000, "the Indemnified Party shall be entitled to indemnification in full for such breach." (Pl.'s Ex. 1, p. 35.)

16. The parties, however, specifically exempted a breach of the Section 4.22 NAV representation from the mini basket. Section 11.5(b)(ii) goes on to say that "the foregoing

-21-

limitation shall not apply to breaches of any covenant or agreement (including without limitation Section 2.2), representations and warranties made by Seller pursuant to Section 4.11(a) or (d) or 4.22 or willful or intentional misrepresentations or breaches of warranty." (Pl.'s Ex. 1, p.35; Tr. pp. 64-65, 283.)

17. Thus, the parties agreed that even adjustments in the NAV that were less than $10,000 would be material.

18. McCoy's smallest adjustment was more than $10,000.

19. In other words, McCoy's smallest adjustment was larger than the threshold the parties had rejected, and the Contested Adjustments had an effect on the NAV many times greater than the rejected threshold.

20. The court therefore finds that McCoy's adjustments were all material for this reason as well.

21. In addition, the NAV calculation is to be performed according to GAAP as applied by Seller and VMS; and TransPro made adjustments to its books and records that were much smaller than the adjustments McCoy made.

22. TransPro adjusted its accounts every month in wide-ranging amounts, reflecting a very high level of detail, as McCoy testified. (Tr. pp. 178-179.)

23. Reviewing Defendant's Exhibit FFF reveals that TransPro would make adjustments as small as $4,500 on entries over $9,500,000. For example, the March 2000 entry for "Accounts receivable trade" under Crown INP is $9,519,643, and the April 2000 entry is $9,515,270. The difference between these two entries is $4,373. (Def.'s Ex. FFF, pp. 85, 91.)

24. Thus, McCoy's smallest adjustments were larger than adjustments TransPro made.

25. The court therefore finds that McCoy's adjustments were all material under GAAP as

-22-

applied by TransPro and VMS.

### 4. Capitalized Variances

1. Finger testified that when a company incurs certain expenses that are used to manufacture its products, to the extent that those products are still on hand at the balance-sheet date when the company values its inventory, the company adds a portion of those expenses into the book value of the remaining inventory. The expenses added to the book value are the "capitalized variances." (Tr. pp. 352-353.)

2. McCoy determined that no adjustment for capitalized variances was necessary. Some of her adjustments while calculating the NAV would not affect the cost of inventory, and therefore, would not require a capitalized-variance adjustment. For other adjustments that could potentially affect the inventory cost, McCoy determined that they did not because, to the extent there was a correction necessary to the balance sheet as of closing, there was a corresponding, offsetting correction necessary at the earlier point in time. (Tr. pp. 199-200.)

3. Finger was not aware that Leggett had performed its own capitalized variances calculations for the period when TransPro had not performed them. (Tr. pp. 400-401.)

4. Furthermore, several of McCoy's adjustments related to expenses from the May time period. These May-time-period expenses would not be included in the April capitalized-variances calculation. (Tr. pp. 282, 399.)

5. The court finds that a capitalized-variance adjustment is not necessary, and that McCoy's NAV calculation was proper.

## IV. TRANSPRO'S CLAIM FOR ATTORNEYS' FEES

1.  TransPro has requested that the court award TransPro its attorneys' fees arising out of this action.

2.  The Agreement contains no provision providing for the recovery of attorneys' fees that falls within the limited exception to the well-established "American Rule."

3.  Under the American Rule, a party is not entitled to collect attorneys' fees from the losing party. *See Aleysha Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975).

4.  "Delaware follows the 'American Rule,' whereby a court will not award attorney's fees unless a[] statute, contract or procedural rule makes the award explicit." *Cornerstone Brands, Inc. v. O'Steen*, No. Civ. A 1501-N, 2006 Del. Ch. LEXIS 172, at *14 (Del. Ch. Sept. 20, 2006).

5.  In addition to analyzing TransPro's claim through the lens of the American Rule, this claim is also subject to Delaware law's strict construction of indemnification provisions.

6.  Delaware courts require that "indemnification clauses [] be clear and unequivocal –'if a contrary intent can [be] reasonably entertained, the Court will rule against indemnification.'" *DRR, L.L.C. v. Sears*, 949 F. Supp 1132, 1143 (D. Del. 1996) (quoting *Paoli v. Dave Hall, Inc.*, 462 A.2d 1094, 1098 (Del. Super. Ct. 1983)).

7.  Indemnification generally involves the right of a person to seek reimbursement when that person has been compelled to pay to a third party what another should have paid to such third party. *See Levy v. Hayes Lemmerz Int'l, Inc.*, No. 1395-N, 2006 Del. Ch. LEXIS 68, at *38 (Del. Ch. April 5, 2006); *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1031 (9th Cir. 1992) (stating that "[u]nder the ordinary and usual meaning of the word indemnify," the

-24-

indemnitor "agrees to protect the indemnitee against claims of third parties alien to the contract.").

8.    Under Delaware law, an agreement to "indemnify, defend and hold harmless" does not apply to actions between the parties to that agreement.  *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, No. 98C-11-262 WCC, 2003 Del. Super. LEXIS 13, at *25-26 (Del. Super. Ct. Jan. 17, 2003); *Folger Adam Co. v. PMI Indus., Inc.*, No. 87 Civ. 9272, 1990 U.S. Dist. LEXIS 7167, at *1-2 (S.D.N.Y. June 11, 1990) (finding that "under Delaware state law, 'indemnity' applies only to claims by third parties.").

9.    In the instant case, Paragraph 11.2 of the Agreement states:

> Subject to the terms and conditions of this Article 11, Buyer hereby agrees to indemnify, defend and hold harmless Seller, its directors, officers, employees and controlling persons from and against all Claims asserted against, resulting to, imposed upon, or incurred by any such person, directly or indirectly, by reason of or resulting from (a) the inaccuracy or breach of any representation or warranty of Buyer contained in or made pursuant to this Agreement; (b) the breach of any covenant of Buyer contained in this Agreement; or (c) all Claims of or against Seller assumed by Buyer pursuant hereto.

(Pl. Ex. 1, p. 33.)

10.    This provision neither contemplates an exception to the American Rule, nor does it clearly and unequivocally state an exception to it.

11.    Furthermore, allowing TransPro to recover attorneys' fees would be contrary to the plain meaning of indemnification.

12.    As neither Paragraph 11.2, nor any other section of the Agreement contemplates an exception to the American Rule, TransPro's claim for attorneys' fees is denied.

## V. PREJUDGMENT INTEREST

1.      Delaware courts apply the Interest on the Balance Rule when determining whether to award prejudgment interest where the claims and counterclaims are directly related or collateral. *See Fleet Fin. Corp. v. Advanta Corp.*, No. Civ.A. 16912-NC, 2003 Del. Ch. LEXIS 127, at * 2-*3 (Del. Ch. Nov. 7, 2003).

2.      The court finds that TransPro does not have a positive monetary balance in its favor and had no lost opportunity cost.

3.      The net award leaves TransPro owing money to Leggett.

4.      TransPro's breach of the NAV representation occurred on the Agreement's execution date, May 5, 2000, and Leggett's workers' compensation reimbursement claims accrued at a rate faster than TransPro's medical claims and claims related to the Ken Landes automobile accident.

5.      The parties stipulated to the amount of Leggett's payments related to the Three Former Employees on an annual basis.  (ECF No. 131, Second Stipulation ("2nd Stip.") ¶¶ 3-5.)

6.      The parties stipulated that Leggett's payments related to Evelyn Buchanan on an annual basis are as follows:

            2000    $8,725.76
            2001    $13,345.28
            2002    $13,345.28
            2003    $13,345.28
            2004    $13,858.56
            2005    $13,345.28
            2006    $11,292.16

(2nd Stip. ¶ 3.)

-26-

7.  The parties stipulated that Leggett's payments related to Alberta Livingston on an annual basis are as follows:

          2000    $1,804.83
          2001    $1,893.32
          2002    $2,593.86
          2003    $2,444.27
          2004    $2,697.48
          2005    $1,270.67

(2nd Stip. ¶ 4.)

8.  The parties stipulated that Leggett's payments related to Gary Simmeran on an annual basis are as follows:

          2000    $2,606.93
          2001    $3,728.08
          2002    $13,186.34
          2003    $13,265.96
          2004    $27,037.15

(2nd Stip. ¶ 5.)

9.  In sum, TransPro owes Leggett a total of $159,786.49, subject to any award of prejudgment interest, for payments related to the Three Former Employees through November 10, 2006. (Stip. ¶ 19; 2nd Stip. ¶¶ 6-8.)

10.  The parties stipulated that Leggett owes TransPro $30,124.80 for the employee medical claims TransPro paid after the Closing and the Ken Landes automobile claim.  (Stip. ¶¶ 9, 11.)

11.  Based on these figures, the court finds that by the end of 2001, TransPro owed Leggett $1,979.40.  Leggett therefore is entitled to prejudgment interest from 2001 on the amount of $1,979.40, and to prejudgment interest on the annual totals for each year from 2002-2006.

-27-

12.    TransPro's claim for prejudgment interest is denied, and Leggett's claim for prejudgment interest is granted.

## VI. CONCLUSIONS

1.    The court finds that the NAV of the Purchased Assets was $15,180,373, and that TransPro, accordingly, breached Section 4.22's NAV representation by $319,627.

2.    Leggett's $319,627 in damages for TransPro's breach of the NAV representation is a set-off for TransPro's payroll-reimbursement claim of $319,627.  The court therefore holds that neither party is entitled to any recovery under these claims.

3.    The court also finds that TransPro owes Leggett $159,786.49, subject to any award of prejudgment interest, for payments related to the Three Former Employees through November 10, 2006.  The court further finds and declares that TransPro shall be liable and shall reimburse Leggett for all payments related to the Three Former Employees after November 10, 2006.

4.    Based on the parties' stipulation, the court finds that Leggett owes TransPro $30,124.80 for the employee medical claims TransPro paid after the Closing and the Landes automobile claim.  This amount acts as a set-off against the sum TransPro owes Leggett for its payments related to the Three Former Employees.

5.      Accordingly, the court awards Leggett judgment in the amount of $129,661.69 and finds that

Leggett is entitled to prejudgment interest on that amount, as explained in Section V,

Paragraph 11.

IT IS SO ORDERED.

*/S/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

July 16, 2007